**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| **v.** | **:** | **No. 21-407-DLF-02** |
| | **:** | |
| **DANIEL JOHNSON,** | **:** | |
| **Defendant.** | **:** | |

**DEFENDANT'S  MEMORANDUM IN AID OF SENTENCING**

The defendant, Daniel Johnson, through his attorney, Allen H. Orenberg, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), submits this memorandum to aid the Court at sentencing and hereby notifies the Court that he has received and reviewed the Presentence Report ("PSR") prepared in this case. After carefully reviewing the PSR with Mr. Johnson, there are objections to the criminal history category (II) as noted herein-below. Mr. Johnson requests that this Honorable Court impose, essentially, a sentence of a term of 12 months probation with community service to account for:

1.     His lack of preparation or planning prior to January 6, 2021, to be part of the U.S. Capitol breach event.

2.   His cooperation with law enforcement officers when arrested, as well as his ongoing cooperation and willingness to resolve his case at the earliest opportunity.

3.   The Pre-Sentence Investigation Report (PSR) determined "it appears that defendants Daniel Johnson and Daryl Johnson were equally culpable, and their

actions were that of an average participant. Therefore a role adjustment is not warranted pursuant to USSG §§ 3B1.1 or 3B1.2. (PSR ¶ 36)

Mr. Johnson comes before the Court having pled guilty on January 10, 2022, to Count One of the Superseding Information, charging him with a violation of Title 18 U.S.C. §231(a)(3) – Civil Disorder.

A sentence of 12 months of probation, with community service hours, is a reasonable sentence that is "sufficient, but not greater than necessary" to address the sentencing factors and goals set forth in Title 18 U.S.C. § 3553(a). Under the facts and circumstances of this case, such a sentence will protect the public, provide just punishment, and afford adequate deterrence.

## I.   <u>BACKGROUND</u>

### A.   **Mr. Johnson Watches Media Coverage of The Black Lives Matter Protests of 2020 and Mr. Trump Denouncing the 2020 Election**

The summer of 2020 was a violent one for major cities across the United States, in large part, due to the protests of Black Lives Matter (hereinafter "BLM"). After several months of being couped up because of Covid-19, people took to the streets to protest the horrendous murder of George Floyd. Unfortunately, especially in D.C., these protests turned violent. These protests were widely televised on the nightly news and other media outlets as a necessary process for vocal opposition to systemic racism and the only way racial justice could be effectuated. Mr. Johnson watched from his home in Minnesota and on the internet as hundreds of businesses were destroyed over a period of weeks, several people were injured, and nearly two billion dollars of damage was done by rioters nationwide.

After the presidential election, former President Donald Trump and his inner circle began spreading the word that the election was "stolen" from him by Democrats and others. False claims were made on media sources, as well as by the former President himself, that the election system had been corrupted and that the integrity of the election should be questioned. The Court can only understand why Mr. Johnson came from Iowa to D.C. when taking into account these two pivotal events in our nation's history. While consumption of media news is no excuse for behavior, it does demonstrate the powerful impact news stories, fake or real, have on the citizens of their country. The media sets the tenor for how people feel about their rights and freedoms and can also plant notions of discontent or even outrage. After months of watching our major cities burn, many people became convinced that vocal displays of outrage in the form of protesting was the only way to make their voices heard. Additionally, because very few people were being prosecuted for their criminal behavior while violently protesting, which was replayed over and over again on the nightly news, the media helped reinforce the notion that there would be little to no consequences for protestor actions. Here, in D.C., although hundreds, if not thousands, committed property crimes such as painting federal statues and burning and breaking into private businesses in town, the number of prosecutions was negligible. Tucker Carlson and other conservative TV show hosts noted this on their nightly news casts.

Mr. Johnson, like millions of other Americans, ate up the media coverage of these events in the Summer of 2020. He saw the media label destructive and violent riots as "mostly peaceful" protests and the protestors praised on national media

outlets for their strongly held beliefs. And, while the majority of BLM protests in the summer of 2020 were, in fact, peaceful, a report studying these protests found a large number of Americans believed they were not. The report suggested that the "disparity stems from <u>political orientation and biased media framing</u>... such as <u>disproportionate coverage</u> of violent demonstrations." <u>https://time.com/5886348/report-peaceful-protests/.</u>

Mr. Johnson similarly had strongly held beliefs after the Presidential election that there had been irregularities in the election that were not proper. He was also emboldened by a new understanding of how vocal and peaceful protests were being conducted in our country to garner attention for important issues effecting the future of our nation. He decided to come to D.C. to *peacefully* protest the results of the election and the lack of attention to alleged voting irregularities (emphasis added). He did so with no intent to do anything but add his voice to the vocal protests over the injustice he perceived had happened in the election. He did not suit up for combat. He did not obscure his face. He was not armed and he committed no violent actions in his peaceful protest, although he did participate in "pushing-back" a small group of police officers. Mr. Johnson did not destroy or steal anything.

Mr. Johnson's only desire was to participate in a democratic process that is protected under the 1st Amendment of our Constitution. Unfortunately, going into the Capitol Building was not part of that democratic process and he now stands

before the Court after admitting to the Court at his plea hearing that he knew going into the Capitol Building that day and participating in "civil disorder" was wrong.

## II.      THE TRIP TO THE CAPITOL AND JANUARY 6, 2021

### A.      Mr. Johnson's Trip to D.C. and His Walk to the U.S. Capitol

Mr. Johnson believed what he read on the internet and heard from the President himself - that the election had been stolen. He believed that there was wrongdoing in the State of Georgia, and in other States, with regard to the counting of the Presidential election votes. He also believed that he should show his support for the soon to be former President by attending the rally and other rallies scheduled for January 6, 2021, at the Ellipse on the Mall. He had never attended any other political rallies or gatherings. Importantly, Mr. Johnson was fixated on the *process*, not the result of the election. The emphasis on the process, and not the result, is particularly important because it shows that Mr. Johnson values the Constitution and the foundation of our government.

Mr. Johnson had always wanted to come to Washington, D.C., and this seemed to be the perfect opportunity – which he did with his father / co-defendant. At no time did he ever think he was going to the U.S. Capitol grounds, let alone inside the Capitol building. Not until Mr. Trump's speech did he have any intention of going anywhere other than the Ellipse area, and not being from the area or having attended a protest there before, he had no real sense of where things were in relation to each other. As the day unfolded, he never planned or envisioned entering the U.S. Capitol Building. That is, not until Mr. Trump invited everyone to march

to the U.S. Capitol. Mr. Johnson and his father followed the large crowd there that day with no intention of doing anything but having his voice join those of thousands of other peaceful protestors. Now, after seeing what really happened that day by watching film on numerous platforms, Mr. Johnson is ashamed of the fact that he was a part of it, albeit a small part of it compared to the many violent protesters who assaulted police officers and caused damage to the U.S. Capitol building.

### B. Mr. Johnson's Activities Inside and Outside the U.S. Capitol

For some time, police were able to fend off the crowd, but as we now know, the crowd overwhelmed the few, unprepared police. Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol building was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. The breach spurred the evacuation of members of Congress and the Vice President. More than 30 minutes later, the Senate Wing Doors were penetrated by the crowd, pushing U.S. Capitol Police officers back into the inside corridor as they tried to prevent further intrusion.

Mr. Johnson was not in the "first wave" of  protesters who entered the Capitol building. Before he so entered, he could not see what was transpiring inside the Capitol building. He had no idea of the violence in other parts of the Capitol. In fact, Mr. Johnson and his co-defendant Daryl Johnson (father) had been so far behind the first people in that he had no idea how the door was opened or who opened it. He was, in his words, "following like a lemming" and following others ahead of him. That is, though his conduct includes pushing officers, Mr. Johnson

was for most of the time carefully observing the situation around him, and for the most part, acted with decency.

As he and his father entered, together, through a window near the East Doors into the Rotunda at approximately 2:20 p.m., people around them began to celebrate. The mood was not unlike other protests in Washington, D.C., and many persons around took selfies and appeared peaceful with cameras and flags. He felt like he was on a tour of the U.S. Capitol and recalls that he was in a room with large columns and statues. While inside, Mr. Johnson observed others demonstrating in the area but did not actively participate in this conduct until he briefly engaged police officers by assisting a small group of protesters to "push-back" police officers towards the East Rotunda doors. Mr. Johnson and his father made a decision to exit (through a door) the U.S. Capitol on the east side of the building, which occurred at approximately 2:46 p.m. He estimates they were inside the building for approximately 26 minutes.

Once outside the Capitol building, he and an his father promptly left the area and went back to their hotel. He left Washington. D.C. the next day to return to his home in Iowa. The long trip home was surreal. The mood was somber. Mr. Johnson was already disturbed by what they'd experienced, but as the time passed and they listened to news reports of what happened in and around other parts of the building, and as they received phone calls from family members who had watched the events unfold on TV and were racked with safety concerns, the gravity of what had transpired set in. The feeling that things would never be the same again was unshakeable.

Mr. Johnson looks back at the events of January 6th with regret. Now, in retrospect, Mr. Johnson wishes he'd never come to Washington, D.C. at all, which is terribly sad because our Nation's Capital is incredible in so many ways. He never imagined going inside the U.S. Capitol Building and certainly never thought that violence would follow. He was not part of a group that either organized activities on January 6th nor does he subscribe to any far-right political views. Importantly, Mr. Johnson did not have any intention of stopping the vote. Indeed, Mr. Johnson's aimless following of the crowd through the U.S. Capitol grounds and building that day is evidence of his lack of intent to do something inside the Capitol Building that day, his lack of understanding where he was in the Capitol building, and his herd mentality, rather than a desire to execute a plan to stop the vote that was taking place in the Senate.

Mr. Johnson's only intention that day was to have his voice heard. In fact, he had no idea where he was while he was in the Capitol Building and to this day could not find his way around if given the opportunity.

C.   **The Charges and the Arrest of Mr. Johnson**

On August 18, 2021, a criminal complaint was filed in U.S. District Court for the District of Columbia charging Mr. Johnson (and his father) with four misdemeanor offenses related to his conduct on January 6. [1] He was arrested in his

---

[1]

(Count 1) 18 U.S.C. § 1752(a)(1) (Entering or Remaining in a Restricted Building or Grounds), (Count 2) 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), (Count 3) 40 U.S.C. § 5401(e)(2)(D) (Disorderly Conduct in a Capitol Building), and (Count 4) 40 U.S.C. § 5401(e)(2)(G) (Parading, Demonstrating or Picketing in a Capitol Building).

home (Austin, MN) on June 11, 2021. He was presented the same day in the U.S. District Court for the District of Minnesota. He was released on personal recognizance.

Mr. Johnson had an initial appearance in the U.S. District Court for the District of Columbia on June 17, 2021, and, again, he was released on personal recognizance with conditions. On January 4, 2022, Mr. Johnson appeared before this Honorable Court via video conference and the Court accepted his voluntary plea of guilty to a one count Superseding Information: Title 18 U.S.C. §231(a)(3) – Civil Disorder.

Sentencing is scheduled for June 1, 2022, at 10:00 a.m.

### III.   OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT

Presently, the PSR assigns Mr. Johnson to a USSG Offense Level is 8, Criminal History Category II, with a corresponding guideline range of 4-10 months imprisonment. (Zone B) However, Mr. Johnson objects to the assignment of criminal history category II inasmuch as the criminal history category substantially over-represents the seriousness of the defendant's criminal history. USSG § 4A1.3(b)(1). (*See* PSR ¶¶ 51, 52, 53, 54, & 55.

In the PSR ¶ 51, one criminal history point is assigned on a 2013 conviction(s) for underage drinking & driving, and a related moving traffic offense. His Preliminary Breath Test (PBT) reading was .034. He was sentenced to a $335 fine. This conviction is almost 9 years old and is the result of an (arguably) set of minor traffic infractions. Accordingly, base on the age of conviction and it's

9

misdemeanor status, Mr. Johnson objects to the assignment of one criminal history point.

In the PSR ¶ 52, one criminal history point is assigned on a 2015 conviction for disorderly conduct. No specific (misdemeanor) conduct supporting this conviction is described in the PSR, he received an active sentence/credit for 2 days served, and was discharged a year later from unsupervised probation. Accordingly, Mr. Johnson objects to the assignment of one criminal history point.

In the PSR ¶ 53 one criminal history point is assigned on a 2021 conviction(s) for possession of small amount marijuana, open bottle, driving after revocation and speeding. He paid a fine ($575.00) to resolve all misdemeanor citations – with no active jail sentence. Accordingly, Mr. Johnson objects to the assignment of one criminal history point.

Mr Johnson submits that his criminal history category (II) substantially over-represents the seriousness of his actual criminal history. If the Court agrees with any, or all of the foregoing challenges to the prior (misdemeanor) convictions, then Mr. Johnson's Criminal History Category will be I. Given his USSG Offense Level of 8, Criminal History Category I, then the corresponding guideline range of imprisonment is 0-6 months imprisonment. (Zone A)

However, if the Court does not agree Mr. Johnson's criminal history category substantially over-represents the seriousness of his criminal history, then it is respectfully requested that the Court consider sentencing alternatives as a afforded by Zone B, as noted USSG § 5B1.1(a)(2).

## IV.   **LEGAL STANDARD**

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense. Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D). Section 3553(a) further sets forth the factors that the Court must consider in fulfilling its provision:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;
2. The need for the sentence imposed;
3. The kinds of sentences available;
4. The kinds of sentence and the sentencing range…;
5. Any pertinent policy statements issued by the Sentencing Commission;
6. The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7. The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

## V.   **FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)**

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a). *United*

*States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

A.     **Nature & Circumstances of the Offense &**
       **the History and Characteristics of Mr. Johnson**

The nature and circumstances of the offense of conviction is a not a simple issue to unpack. On the one hand, the offense Mr. Johnson accepted responsibility for, in the universe of criminal conduct, is not especially egregious. However, taken into context with the much larger events of January 6th, the nature and circumstances question becomes much less clear. There is no question the events of that day have left a deep scar on the national psyche. Seditious behavior has in some cases been charged. But we ask the Court to take note that Mr. Johnson is one of two persons (he and his father) who despite having gone down the regrettable road of entering the Capitol realized the gravity of what was happening and left the building and attempted to leave the building as soon possible. He did not come to Washington, D.C., with the intention of subverting democracy. He came to our Nation's Capital to peacefully protest what he believed at that time to be a fraudulent election. We ask the Court to recognize that even at what appeared to be the point of no return, the Court should view his actions against the backdrop of those with more sinister intentions as proof of his original harmless purpose and sentence him accordingly.

Compared to many other January 6th cases which have been filed in this Court, Mr. Johnson's conduct is at or near the bottom of the scale. First, the defense is not aware of any evidence that his entry into the U.S. Capitol Building was

preplanned or coordinated with anyone else, including any extremist or organized groups. His intention was to attend the rally and that did not include going into the U.S. Capitol building or grounds.

Second, the Pre-Sentence Investigation Report determined "it appears that defendants Daniel Johnson and Daryl Johnson were equally culpable, and their actions were that of an average participant. Therefore a role adjustment is not warranted pursuant to USSG §§ 3B1.1 or 3B1.2. (PSR ¶ 36)

Third, although it appears he did in fact participate in the pushing back pf a line of police officers the defense is not aware of any evidence Mr. Johnson engaged in any other violence or questionable conduct towards law enforcement.

Fourth, we are not aware of any evidence Mr. Johnson destroyed or stole any property from the U.S. Capitol Building.

Fifth, based on the Government's investigation, it appears Mr. Johnson remained in the building for a short period of time – approximately 26 minutes – mostly in the Rotunda area. And the defense is not aware of any evidence Mr. Johnson entered any rooms or offices in the U.S. Capitol, or any personal space, or into the Senate or House Chambers.

To his credit, Mr. Johnson has fully acknowledged his misconduct by answering pointed questions by the FBI agents in interview, including his expressions of true and full contrition. He was relieved by the opportunity to take responsibility for his actions.

By the time Mr. Johnson arrived at the U.S. Capitol grounds around 2:00 p.m., many of the barriers that had been erected along the perimeter of the building

were no longer present. Mr. Johnson and his co-defendant met no resistance in their walk to and inside the Capitol Building. At the time, Mr. Johnson didn't dream he'd be charged for going into the building. After seeing the video footage showing protestors beating police officers, spraying gas in their faces, screaming obscenities, and destroying property, it made Mr. Johnson cringe. He is left with deep regret, fear, shame, and remorse.

It is believed the government will concede that Mr. Johnson committed no violent acts and destroyed no property – other than his participating in the brief "pushing-back" of a police line. His actions within the U.S. Capitol have been tracked on the CCTV footage and this demonstrates that while unlawfully present in the Capitol with no excuse, he did not destroy property, steal property, or encourage others to do so. He entered and exited through doors. After Mr. Johnson exited the U.S. Capitol Building he heard there was a curfew beginning that evening – so he and his father went back to their hotel. This has been a long road for Mr. Johnson and his family. Fortunately, he has a supportive relationship with his immediate family who has stood by him since the beginning of this case as well as a supportive extended family.

Mr. Johnson pled guilty at an early stage in the proceedings thus saving valuable judicial resources, as well as the resources of the Department of Justice. It is of utmost importance to Mr. Johnson that this Court understand he is incredibly remorseful for his actions on January 6, 2021. There is no doubt he wishes he had never come to Washington, D.C., on that day. Mr. Johnson has incurred life-long damage to his reputation. None of this will be erased from the internet – it may be

there forever. He has fully accepted responsibility for his bad judgement in entering the Capitol Building by pleading guilty in what can be described as the "first wave" of defendants that pled guilty. He has been the subject of a number of media accounts lumping him with others that were there on January 6, 2021. His mother, siblings, and other family members will suffer as well since they are inextricably intertwined with him.

Mr. Johnson does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo. Nonetheless, in determining what punishment is warranted, this Court should not lose sight that he did no harm, intended no harm, and regrets that he was even there. Most telling about Mr. Johnson is despite all he has been through this past year,[2] he continues to hold-up his head high and he is otherwise a well-respected member of his community.

As noted in the PSR, Mr. Johnson had minor contacts with the criminal justice system. His law abiding life and his post arrest behavior show that he is capable of being a productive citizen and the Court can rely on that as a basis to sentence him to a term of probation considering the §3553 factors.

Mr. Johnson (age 30) was born in Minnesota, and he has lived in Minnesota or Iowa his entire life. He is not married. He is gainfully employed as a on-site supervisor and sales for a roofing company (60+ hours weekly) and hopes to own the company (Weathershield Roofing LLC) he works for in the foreseeable future. In fact, he is presently in the process of assuming management control and he expects

---

[2]   Since his arrest on June 11, 2021, he (and his co-defendant Daryl Johnson) have been regularly harassed by media outlets and by anonymous persons.

to buy the company by the end of the year.  Since this time-line is occurring now, it will be detrimental to his purchasing and managing the company if he is sentenced to a term of imprisonment this year. However, if sentenced to a period of home detention he will be able to complete the purchase of the company and operate the company from his home. He will not be able to do so if he is sentence to a prison term.

At age 18, Mr. Johnson enlisted in the U.S. Air Force and he was discharged generally under honorable circumstances.

Attached to this Memo are letters from people who have known Mr. Johnson for many years:

1. Matthew Krause (Employer)

2. Isaac Hanson (Co-worker & friend)

3. Voun Hansen (friend)

4. Sheriff Greg Beaver (Mitchell County, Iowa)

Respectfully, these letters of support illustrate that a sentence of a term of short probation (with community service hours) is appropriate in this case.

**VI.   Need for the Sentence Imposed**

**A.   General Deterrence – 18 U.S.C. § 3553(a)(2)(B) –
to Adequately Deter Others From Criminal Conduct.**

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for imprisonment, specific deterrence or rehabilitation. The public will be adequately deterred by the sentences meted out against those who actually

16

perpetrated the violence and mayhem at the U.S. Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable  – Mr. Johnson should not be considered as part of the "un-deterrable" group. A sentences of imprisonment imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to be counterproductive, and may be labeled as political posturing. Accordingly, a period of probation does constitute punishment and will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms.

The National Institute of Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

### B.    Specific Deterrence – 18 U.S.C. § 3553(a)(2)(C) – to Protect the Public From Further Crimes of the Defendant

 Mr. Johnson's likelihood of recidivism is very low. He has expressed genuine remorse and contrition, has cooperated fully with law enforcement, turned over evidence voluntarily, and he accepted the first plea offer tendered with no

hesitation. His acceptance of responsibility was complete and without reservation. He has never tried to minimize his behavior.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels … reached that conclusion, as has every major survey of evidence." *Id.*. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Given Mr. Johnson's age (23)**,** and other issues consistent with what is mentioned above, the likelihood of Mr. Johnson ever re-offending is as close to zero as one might come. A punishment of any jail time in this case is going to have the exact opposite effect than what is in the interest of justice. The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice.

We highlight to the Court that at no point has there been any suggestion that Mr. Johnson belongs to any organization which encourages civil disobedience,

advocates overthrow of the government, displays extremist right-wing views, or has encouraged in any way of the violence on display on 6th January. In terms of any sense of danger to the community, there is simply non: it doesn't exist. The Court should have no concerns as to his views on the respect for law either today or for the future.

Mr. Johnson urges the Court not to adopt the Probation Office's recommendation in this case and impose a probationary sentence in light of his personal and family obligations, as well as his sincere and complete remorse, his early and consistent acceptance of responsibility, and the lack of a need to further deter him.[3]

## C.   The Kinds of Sentences Available

The Court should not consider any conduct that Mr. Johnson did not plead guilty to. As noted herein it does not appear that Mr. Johnson exercised managerial authority over any other participant, and he was an average participant whose conduct was peripheral to the advancement of the offense.

Mr. Johnson is a law abiding citizen who placed himself in the wrong place at the wrong time. He came to our Nation's Capitol to exercise his right to free speech, and quickly found himself in the middle of an escalating situation in which speech, free or not, was being dropped as a form of expression by a mob, spinning out of

---

[3]
 For those in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at 29 (May 2004).

control, in which rage was taking over. Mr. Johnson has been shattered at the fallout from that day. His life will never be the same again. This, in and of itself, is more than adequate punishment.

In no way, shape, or form should the Court be under the impression that a probationary sentence would be seen as getting away with anything. Having little criminal history, the fact of now having a felony criminal record is a sobering thought. Mr. Johnson takes this to heart, knowing that for the rest of his life he is a convicted felon.

Given all discussed herein-above, we ask the Court to impose a sentence in accordance with our proposal of 12 months probation, with community service hours, because: (1) His lack of preparation or planning prior to January 6, 2021, to be part of the U.S. Capitol breach event, (2) his cooperation with law enforcement officers when arrested, as well as his ongoing cooperation and willingness to resolve his case at the earliest opportunity, and (3) the Pre-Sentence Investigation Report determined the conduct of Mr. Johnson was that of an average participant. And, therefore a role adjustment is not warranted pursuant to USSG §§ 3B1.1 or 3B1.2. (*See* PSR ¶ 36)

In the alternative, we ask the Court to consider a non-custodial sentence with a restriction that he remain in his home except for work and excused absences to go to church and medical appointments. In the event the Court finds a period of incarceration warranted, Mr. Johnson asks that he be allowed to serve it on

weekends which is what the Court did in *United States v. Johnny Taylor,* 15-cr-76 (BAH).[4]

Imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered to pay a fine in this case. The defendant's financial condition is such, that he cannot pay any significant fine, despite the recommendation for a fine as stated in the PSR. (¶112)

### D.     The Need to Avoid Unwarranted Sentence Disparities

If this Court were to impose a sentence greater than a probationary term, community service, and restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing in this Court. The following cases are a sampling where, in January 6th U.S. Capitol breach cases, a Class B Misdemeanor(s) was charged and pled to and resulted in no incarceration. Mr. Johnson' case is similar to:

- *United States v. Eliel Rosa*, 21-cr-00068 (TNM). (Oct.12, 2021) Sentenced to 12 months probation. Mr. Rosa accepted responsibility early on, did not pre-plan or coordinate activities, and did not go far into the U.S. Capital building.

- *United States v. Valerie Ehrke*, 21-cr-00097-PLF. (Sept. 17, 2021) Sentenced to 36 months probation.

- *United States v. Jennifer Parks,* 21-cr-00363-CJN. (Dec. 8, 2021) Sentenced to 24 months probation where govt. ask for 30 days home detention.

- *United States v. Anna Morgan-Lloyd,* 21-cr-00164-RCL. (Jun. 28, 2021) Sentenced to 36 months probation.

---
[4]

Furthermore, there is a remarkable cost savings to the taxpayers of the United States if the Court imposes a period of probation rather than a term of incarceration. As noted in the PSR, (¶133) the monthly cost of imprisonment is $3,688.00, $2,980.00 for community confinement, and $371.00 monthly for supervision.

- *United States v. Jonathan Sanders,* 21-cr-00384-CJN. (Nov. 4, 2021) Sentenced to 36 months probation where defendant showed lack of remorse during an FBI interview, and govt. recommended 2 months home detention.

- *United States v. Jordan Stotts,* 21-cr-00272-TJK. (Nov. 9, 2021) Sentenced to 24 months probation where defendant shouted at MPD officers and posted non-remorseful comments following January 6th.

Furthermore, Ms. Johnson's case may be distinguished from a sampling of cases where the sentence imposed was more than just probation:

- *United States v. Brandon Straka*, 21-579-DLF. (Jan. 24, 2022) Sentenced to 3 months home detention with 36 months of probation. Amongst other things, he engaged in disruptive conduct by participating, along with others, in yelling "go, go, go" to encourage others to enter the U.S. Capitol while the U.S. Capitol Police were making their best efforts to prevent people from doing so. Straka also observed others yelling to take a U.S. Capitol Police Officer's shield. He recorded a video of what was happening, and in the video, he chimed in with the crowd, saying "take it, take it.

- *United States v. Danielle Doyle*, 21-cr-00324-TNM.(Oct. 1, 2021) Sentenced to 2 months home detention even though she entered through a broken window and yelled at police officers.

- *United States v. Andrew Bennett,* 21-227-JEB. (Oct 1, 2021) Sentenced to three months home confinement and 36 months probation. According to the government, Mr. Bennett espoused conspiracy theories about the election, was an admirer, albeit not a member of the Proud Boys, and boasted about his conduct. According to the government, Mr. Bennett did not come to the rally in D.C. on a whim, but rather planned it for months. He posted numerous times about conspiracy theories and a fraudulent election. On January 4, 2021, he posted to her Facebook page, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!" On January 6, Mr. Bennet began live-streaming video to his Facebook page from outside the Capitol as early as 1:00 p.m. He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Mr. Bennett exhorted others to "move forward" and that Mr. Bennett yelled at a police officer. Mr. Bennett also filmed assaults on the police officers and continued to live-stream events inside the building.

- *United States v. Gary Wickersham*, 21-606-RCL. (Dec. 21, 2021)
  Sentenced to 3 months home detention with 36 months of probation. At
  various times and at various locations inside the Capitol, the path
  forward for Wickersham and other individuals was obstructed by
  members of law enforcement that were attempting to keep
  Wickersham and the other individuals back.

- *United States v. Jordan Stotts*, 21-272-TJK. (Nov.9, 2021) Sentenced to
  2 months home detention with 24 months probation and 60 hours of
  community service. Stotts scaled the wall to climb inside of the Capitol
  Building. He was inside for an hour. He is on video confronting and
  yelling at police officers. Made several posts to social media afterward
  claiming that his actions were justified. He had a previous criminal
  history.

- *United States v. Kevin Strong*, 21-114-TJK. (Mar. 9, 2022) Sentenced to
  130 days home detention with 24 months probation. Strong is an FAA
  employee and QANON supporter. He was inside the Capitol Building
  for about 25 minutes. He took a selfie photograph in front of Nancy
  Pelosi's office.

None of this is to suggest that any of these examples should have received a
sentence of incarceration / home detention, only to suggest that there is nothing
materially different about Mr. Johnson or his conduct which would justify a
sentence of incarceration / home incarceration. Judges of this district court have
sentenced some January 6th misdemeanor cases to home detention / incarceration.
However the nature and circumstances of those offenses, as well as the history and
characteristics of the defendants in those cases, are based on far more egregious
conduct than the conduct of Mr. Johnson – and therefore are readily distinguished.

Mr. Johnson was far more cooperative with law enforcement, did not attempt
to hide any evidence, and he has not publicly blamed another group for the violence
that day. All told, the facts of the offense conduct and characteristics of the January

6th defendants who were given incarceration or a lengthy period of home detention were starkly different than Mr. Johnson' conduct and characteristics.

## VII.  <u>CONCLUSION</u>

For the foregoing reasons, and for such other reasons that may appear just and proper, Daniel Johnson respectfully asks this Court to fashion a sentence of 12 months probation with community service hours. This sentence is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a). It would be a sentence in the best tradition of federal judicial discretion, which will consider Mr. Johnson as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,

_____
Allen H. Orenberg, # 395519
The Orenberg Law Firm, P.C.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20854
Tel. No. 301-984-8005
Cell Phone No. 301-807-3847
Fax No. 301-984-8008
aorenberg@orenberglaw.com

Dated: May 25, 2022