**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-407-DLF** |
| **DANIEL JOHNSON,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Daniel Johnson to 6 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.     INTRODUCTION

The defendant, Daniel Johnson, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

Johnson, along with his father Daryl Johnson, climbed through a smashed-out window near the Senate Wing Door to unlawfully enter the U.S. Capitol building, where he remained for

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

approximately 26 minutes. Once inside, the Johnsons joined a group of rioters in rushing and shoving aside several U.S. Capitol Police officers who were guarding the East Rotunda doors from a mass of additional rioters gathered outside. The Johnsons, along with a group of other rioters, pushed against the line of police officers, sandwiching them against the doors, and forced open the East Rotunda doors. When the doors were opened, they were at the front of the group. The actions of Daniel Johnson allowed additional rioters to stream into the building, thus further jeopardizing the lawful occupants of the Capitol and supporting the efforts of the mob to obstruct the certification vote.

Daniel Johnson posted to social media both before and after his participation in the riot. On January 5, 2021, Johnson posted, "Fuck Biden." On January 6, 2021, after leaving Capitol grounds, Johnson messaged a third party on Snapchat, "I left already," "I was one of the first ones inside," and "Was fucking wild." The third party responded, "I bet should have shit on nancys desk." Johnson replied, "Dude I'm sure her office got trashed. I was trying to find a way into the chamber." The following day, on January 7, 2021, Johnson posted to Facebook, "Trump 2020!!!"

The government recommends that the Court sentence Johnson to 6 months' incarceration, which is within the advisory Guidelines' range of 4-10 months. A 6-month sentence reflects the gravity of Johnson's conduct, but also acknowledges his admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Johnson among them, unlawfully and violently broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement

officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The day started calmly enough.  As set forth in the PSR and the Statement of Offense incorporated into Johnson's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., hundreds of persons forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows

3

of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., hundreds of individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 2-7; PSR ¶¶ 21-27.

### Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

4

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-

AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, requiring the expenditure of nearly $1.5 million.

**B.      Daniel Johnson's Participation in the January 6, 2021 Attack on the Capitol**

Daniel Johnson participated in the January 6 attack on the Capitol. His crimes are documented through open-source video, surveillance footage from inside of the Capitol, witness interviews completed by the FBI, and Johnson's own social media.

Johnson traveled with his father to Washington, D.C. from his home in Minnesota on January 5, 2021. On January 6, 2021, the Johnsons attended the "Stop the Steal" rally and later walked to the U.S. Capitol building with many others who had attended the rally. After entering Capitol grounds, the Johnsons approached the west side of the Capitol building and entered through a smashed-out window near the Senate Wing Door at approximately 2:20 p.m., about eight minutes after the initial breach of the building. Stills from Capitol CCV footage showing the Johnsons entering the Capitol building are provided below. Daniel Johnson, still crouching after jumping through the window, is circled in yellow. Daryl Johnson, seen only in the second image, is circled in red.





Images 1 and 2

The Johnsons proceeded to the Crypt and then traveled to an area near the Memorial

Door, where they remained from about 2:28 p.m. to 2:32 p.m. During this period, Daryl Johnson

poured water onto another rioter's eyes, seemingly because the rioter was sprayed with lacrimal

spray. A still from Capitol CCV showing this scene is below. In the stills below and in those that

follow, Daryl Johnson is circled in red, and Daniel Johnson is circled in yellow. When the two

are together, they are circled in purple.



Image 3

At approximately 2:33 p.m., the Johnsons climbed a flight of stairs and made their way

into the Rotunda. The still below from Capitol CCV shows the Johnsons in the Rotunda.



Image 4

At approximately 2:37 p.m., the Johnsons walked out of the Rotunda toward the East

Rotunda doors, where they encountered three police officers. The officers were standing in front

of the East Rotunda doors to prevent the doors from being breached, and to prevent the additional

8

rioters gathered outside from entering. Windows on the East Rotunda doors had been broken, and the Johnsons could see the rioters outside the building attempting to gain entry.   Two stills from Capitol surveillance footage are below. The officers are circled in blue.   The second still shows the broken windows and rioters outside of the building.



Image 5



Image 6

For approximately thirty seconds the Johnsons watched rioters crowd the police officers while the officers attempted to prevent the breach of the doors and to keep the outside rioters from entering the Capitol building. During this time, Daniel Johnson appears to chant or yell in the direction of the officers. Stills from Capitol surveillance footage are provided below showing the Johnsons watching the law enforcement officers and either chanting or yelling. In the third still, the officers are circled in blue.



Image 7



Image 8



Image 9



Image 10

After watching the scene, the Johnsons joined a group of other rioters and charged at the line of officers. They helped push through the officers and push open the East Rotunda doors, allowing rioters outside of the building to enter. Stills from Capitol surveillance footage are below. Police officers, when visible, are circled in blue.



Image 11







Images 12, 13 and 14







Images 15, 16 and 17

As seen in the stills above, the Johnsons were at the front of the group of rioters on the interior of the Capitol when the group broke through and breached the doors. The Johnsons pushed with the group against the police officers from 2:38:22 p.m. to 2:38:49 p.m. As result of this breach, the Capitol was flooded with additional rioters and trespassers. Notably, a major altercation between rioters and law enforcement officers occurred inside the Rotunda, near these breached East Rotunda doors, just 25 minutes later.

Following their actions that helped flood the Capitol with additional rioters, the Johnsons climbed another flight of stairs to the third floor. While walking through the hallway, Daniel Johnson attempted to open a door to a private room. The room was locked, and the Johnsons continued walking down the hallway. They exited the building on the first floor at approximately 2:46 p.m. Stills from Capitol CCV showing these actions are provided below.

19





Images 18 and 19

***Defendant's Statements***

The United States obtained a search warrant for Daniel Johnson's Facebook and Snapchat accounts. A review of the recovered material revealed that Daniel Johnson made several statements

20

before, on, and after January 6. For instance, on January 5, 2021, Johnson posted, "Fuck Biden."

Then, on January 6, 2021, on Snapchat, Johnson engaged in the following conversation with a

third-party:

> Johnson: I left already
>
> Johnson: I was one of the first ones inside!!!
>
> Johnson: Was fucking wild
>
> Third-party: I bet should have shit on nancys desk
>
> Johnson: Dude I'm sure her office got trashed
>
> Johnson: I was trying to find a way into the chamber

On January 7, 2021, Johnson posted, "Trump 2020!!!"

## III.   THE CHARGES AND PLEA AGREEMENT

On December 20, 2021, Johnson was charged by superseding information with Civil

Disorder in violation of 18 U.S.C. § 231(a)(3); Entering or Remaining in any Restricted Building

or Grounds in violation of 18 U.S.C. §§ 1752(a)(1); Disorderly and Disruptive Conduct in a

Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a

Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D),; and Parading Demonstrating, or

Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

On January 4, 2022, Johnson pled guilty to Count One of the Superseding Information,

Civil Disorder in violation of 18 U.S.C. § 231(a)(3).

## IV.   STATUTORY PENALTIES

The defendant now faces sentencing on Civil Disorder in violation of 18 U.S.C.

§ 231(a)(3).

As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 5 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

As the parties and the Probation Office agree, the Guidelines analysis for this matter follows:

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a)[2] | Base Offense Level | 10 |
| | **Total** | **10** |

*See* Plea Agreement ¶ 5(A); PSR (ECF 49) ¶¶ 41-46.

---

[2] The Guidelines instruct courts to apply the "most analogous offense guideline" when, as here, the offense is a felony for which no guideline expressly has been promulgated. U.S.S.G. § 2X5.1. If no Guideline is "sufficiently analogous," the court must apply "the provisions of 18 U.S.C. § 3553." U.S.S.G. § 2X5.1. Here, the parties and the Probation Office agree that the most analogous offense guideline for a violation of 18 U.S.C. § 231(a)(3) is U.S.S.G. §2A2.4. Section 231(a)(3) criminalizes acts that "obstruct, impede, or interfere with" a "law enforcement officer" in the context of a civil disorder; Section 2A2.4 applies to "obstructing or impeding officers." (capitalization altered).

The U.S. Probation Office calculated the defendant's criminal history as category II. PSR ¶¶ 50-55.   The defendant contends the assigned of a Criminal History category II over-represents the seriousness of his criminal history.   *Id.* at page 26.   Assuming the Probation Office is correct, Johnson's Guidelines imprisonment range is 4 to 10 months' imprisonment after acceptance of responsibility.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.   Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so

under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh strongly in favor of a term of incarceration in the middle of the agreed-upon Guidelines range. The Johnsons climbed through a broken window to enter the U.S. Capitol building and remained inside for about 26 minutes. While inside the building, they engaged in a push against law enforcement to assist in breaching and opening external doors to the Capitol which allowed other rioters into the building. Specifically, after exiting the Rotunda, they came across law enforcement officers standing in front

of the East Rotunda doors, who were preventing the doors from being opened and stopping additional rioters outside of the building from entering. The Johnsons watched the officers for a period of time and appear to chant or yell in their direction. Then the Johnsons rushed the officers and, with others, pushed them aside and forced open the doors, allowing other rioters outside to enter the building. The Johnsons' conduct directly contributed to the chaos of January 6. They directly interfered with law enforcement officers engaged in the performance of their duties, and, by breaking open the door, they helped further overwhelm law enforcement inside by growing the disparity between the number of officers and number of rioters.

Pursuant to the terms of his plea agreement, Johnson debriefed with the U.S. Attorney's Office and FBI prior to his sentencing. During his interview, Johnson expressed remorse. He stated that he was ashamed over his conduct on January 6 and could not explain his actions on that date.

Those post-plea sentiments, while laudable, stand in contrast to Johnson's statements made on social media following the riot. In particular, immediately after the riot, Johnson told a third-party that he tried "to find a way into the chamber" after that individual noted Johnson "should have shit on nancys desk."

## B.  The History and Characteristics of the Defendant

As set forth in the PSR, Johnson has a criminal history. PSR ¶¶ 51-55. On April 27, 2013, at the age of 20, Johnson was arrested for Underage Drinking and Driving and Unlawful Passing and sentenced to a $335 fine. On November 9, 2015, at age 23, Johnson was arrested for Disorderly Conduct and sentenced to 30 days' incarceration (28 days suspended) followed by one-year unsupervised probation. On February 3, 2021, at age 28, Johnson was arrested for Possession/Sale of Small Amount of Marijuana, Possession of Drug Paraphernalia, and other offenses and

sentenced to a $575 fine.

Johnson has maintained consistent employment. He is currently employed as a foreman for a roofing company.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Johnson's criminal conduct, shoving aside law enforcement officers to open a door and assist additional rioters in entering the U.S. Capitol building, demonstrates severe disrespect for the law. When Johnson entered the Capitol grounds, it was abundantly clear that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

---

[4]  *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. Although the defendant has now expressed remorse, Johnson charged police officers and engaged in violence on January 6. In addition, his social media statements after January 6 provide insight into his mental state on and after January 6.   On January 6, Johnson boasted about entering the Capitol. He spoke without remorse of the high likelihood that Speaker Pelosi's office was trashed, and he further stated, "I was trying to find a way into the chamber." The following day, he posted, "Trump 2020!!!", a celebratory callback to "stopping the steal" and the events that had occurred on January 6. In addition, Johnson's criminal history includes a prior conviction for Disorderly Conduct, which the government understands to have involved a confrontation with a law enforcement officer.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot.

29

This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.      Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6) and the need to avoid unwarranted sentencing disparities, a sentence within the properly calculated Guidelines range will rarely, if ever, give rise to an unwarranted disparity. *See Gall v. United States*, 552 U.S. 38, 54 (2007) ("Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities."); *United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021) ("the Sentencing Guidelines are themselves an anti-disparity formula") (quoting *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017)). That is certainly the case here, where Daryl and Daniel Johnson are among the very first Capitol riot defendants to be sentenced for violating 18 U.S.C. § 231(a)(3).

As of the date of this sentencing memorandum, only one other Capitol riot defendant has been sentenced to a Civil Disorder violation of 18 U.S.C. § 231(a)(3)—Aaron Mostofsky in Docket No. 21-cr-138-JEB.   Mostofsky was sentenced to 8 months' incarceration, 12 months supervised release, and 200 hours of community service for violating Section 231(a)(3).   Like Johnson, Mostofsky forcibly pushed against officers who were attempting to keep rioters from entering the Capitol Building.   Mostofsky then entered the Senate Wing door at 2:13pm, a few minutes before Johnson, and stayed inside the building for 20 minutes.   In addition to the Section 231(a)(3) offense, Mostofsky also pled guilty to 18 U.S.C. § 641 for stealing Capitol Police protective gear, along with a misdemeanor trespass offense.

Although the Johnsons are among the first Capitol riot defendants to be sentenced for violating 18 U.S.C. § 231(a)(3), other Capitol riot defendants with varying levels of involvement in the push at the East Rotunda doors at 2:38 p.m., including Jeffrey Smith, Mark Simon, and Frank Scavo, have been sentenced. All of these defendants pleaded guilty to 40 U.S.C. § 5104(e)(2)(G).

- Jeffrey Smith, 21-cr-290-RBW, was sentenced to 90 days' incarceration and 24 months of probation. Smith removed iron benches being used as barricades on the inside of the Rotunda doors and attempted to open the Rotunda doors to let in rioters, only ceasing his efforts when stopped by police officers. Smith returned to the doors minutes later to help a group of rioters push against the officers to open the doors and allow rioters to enter the Capitol. Notably, Smith was behind the Johnsons in the group of rioters during this push. Also, Smith posted to social media several days after the attack on the Capitol about the events that day, but, unlike Daryl Johnson's posts, Smith's posts do not mention or promote violence.

- Frank Scavo, 21-cr-254-RCL, was sentenced to 60 days' incarceration. The defendant was outside of the Capitol building during the push at the East Rotunda doors. He took video of the violent breach of the Rotunda doors but did not actively participate in the breach. He also made public statements after January 6 either downplaying or making light of his conduct.

- Mark Simon, 21-cr-67-ABJ, was sentenced to 35 days' incarceration. The defendant was outside of the Capitol building during the push at the East Rotunda doors. Simon took a video of himself entering through the East Rotunda doors after the doors were forced open by rioters, including the Johnsons. In the video, police officers can be seen attempting to remove individuals from the building and broken glass windows is visible on two of the doors.

Although these misdemeanor cases relating to the 2:38 p.m. breach of the East Rotunda doors provide a useful reference point, they represent conduct less serious than the civil disorder felony which Johnson committed.   Significantly, Johnson joined in a sustained and successful push against law enforcement officers, which directly led to the breach of the East Rotunda doors and allowed additional rioters to stream into the Capitol.   Accordingly, the instant recommendation of 6 months' incarceration does not constitute an unwarranted sentencing disparity when compared

31

to the other Section 231(a)(3) sentencing or the other sentencings of rioters involved in the breach of the East Rotunda doors.

## VII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 6 months' incarceration, restitution of $2,000, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    /s/ Samuel S. Dalke
SAMUEL S. DALKE
PA Bar No. 311803
Assistant U.S. Attorney, Detailee
U.S. Attorney's Office
601 D Street, NW
Washington, D.C. 20001
717-515-4095
Samuel.S.Dalke@usdoj.gov